UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

FORT WAYNE WOMEN'S HEALTH, on )
its own behalf and on behalf of its )
patients, DR. ULRICH G. KLOPFER, )
on his own behalf and on behalf of )
his patients, )
                                          )
                     Plaintiffs     )
                                            )
            v.                      )      CAUSE NO. 1:10-CV-192 RM
                                            )
BOARD OF COMMISSIONERS, )
ALLEN COUNTY, INDIANA, )
                                            )
                    Defendant    )

OPINION and ORDER

      This matter comes before the court on the motion of Fort Wayne Women's Health and Dr. Ulrich G. Klopfer for preliminary injunction and on the Allen County Board of Commissioners' motion to dismiss. The court held a hearing on this matter on August 9, 2010, and the motions are ripe for decision.

I. FACTS

      This case involves application of a county ordinance to an abortion provider and his clinic. The Allen County Board of Commissioners passed Amended Title 10, Article 10, "An Ordinance Amending the Patient Safety Ordinance" in June. The parties agreed to stay the ordinance's effective date until this court rules on the preliminary injunction motion.

In September 2008, the county commissioners began to consider an ordinance, spurred by concern from local physicians that doctors from out of town were placing patients at risk by performing procedures without backup coverage. Dr. Geoff Cly, a local OB/GYN, said that ensuring provider accountability required follow-up and peer review procedures for itinerant physicians and that serious complications and deaths were much more likely if no such steps were taken.

Discussion at the March 2010 meeting in which the ordinance was introduced included the following:

- The bill had been written in consultation with the Department of Health, the Fort Wayne Medical Society and doctors of varying specialties.

- Though doctors who lived in the city, county, or surrounding counties were subject to peer review through their privileges at local hospitals, others weren't subject to any peer review process.

- There had been instances in which patients of visiting gastroenterologists and ophthalmologists had, in the middle of the night, called the number given them, only to be told by recordings to call 911 or go to the emergency room. The emergency room physician who saw the patient would have no access to what was done in the office and wouldn't know where to call to arrange the appropriate follow-up for the patient.

- Out-of-town lasik and liposuction surgeons had left patients blind and disfigured without follow-up.

- The Ordinance would send a message to out-of-town physicians: if they practice in Allen County and their patient has an off-hours problem, it's the out-of-town doctor's responsibility to take care of the problem.

- The county medical society saw the bill as addressing a need.

- The bill would, according to the county Health Commissioner, foster patient safety in Allen County.

The commissioners unanimously adopted the ordinance in April and amended it in June.

The ordinance applies to "Itinerant Medical Providers," who are doctors living outside of Allen County or a contiguous county and not having admitting privileges in a hospital in Allen County or in a county contiguous to Allen County. The ordinance applies to itinerant providers who provide "medical care," defined as "any surgical or other invasive procedures" as defined by Indiana law, and to "Operators," who are people or entities that own the facilities where the medical care is provided.

The ordinance requires an itinerant provider providing medical care in Allen County to provide emergency contact information, including "the Itinerant Medical Provider's and their Physician Designee's names, medical license numbers and phone number where either may be reached on a twenty four (24) hour a day,

seven (7) day a week basis." The itinerant provider must pay a fee of $250 and provide the emergency contact information to the county health department and all county operating hospitals, emergency departments, and urgent care providers. A "Physician Designee" is "a physician who is willing to be designated and who is not an Itinerant Medical Provider." A local hospital, emergency department, or urgent care provider must transmit a summary of any follow-up care to the operator, itinerant medical provider, and physician designee.

Each itinerant medical provider must notify each patient orally and in writing, before providing medical care, of his emergency contact information and that of his physician designee, in case complications arise, and must keep a copy of the written notification signed by the patient. The operator must display a certificate of compliance with the ordinance's requirements and provide materials the county health department prepares or approves, including information on how to report ordinance violations and the health department's duties to investigate those reports.

The health department is to inspect its records and the itinerant medical provider's and operator's displayed certification yearly to ensure compliance. The health department employee charged with enforcing the ordinance is to investigate "credible complaints" of violations of the ordinance, including, but not limited to, failure to provide emergency contact information. Upon receiving what the ordinance calls a "credible complaint" of a violation, the health officer must review the department's records, "the Itinerant Medical Provider's and Operator's

4

displayed certification requirements and patients rights notifications, and documentation of emergency contact information provided by the Itinerant Medical Provider to Allen County operating hospitals, emergency departments and urgent care providers." The ordinance authorizes the health officer to seek a subpoena from local courts for the records and/or testimony about the records.

An investigation can include review of notifications signed by the patient, thus disclosing the patient's identity. The ordinance provides that patient-identifying information is to be redacted and documents containing information about patients is not to be disclosed to the public if otherwise prohibited by law. The ordinance allows patient-identifying information, including the patient's name, date of birth, address, social security number, etc., to be disclosed "in complaint reports to the Indiana State Medical Licensing Board as required by this Ordinance or as requested by that Board."

The ordinance provides that no information about itinerant medical providers in the possession of the board of health or the health officer is to be disclosed to the public as otherwise prohibited by law, but emergency contact information is to be released to county hospitals, emergency departments, and urgent care providers. The ordinance doesn't prohibit those entities from releasing that information. The itinerant medical provider's home address, social security number, birth date (as well as that of the physician designee) can be disclosed to health care providers as necessary to facilitate patient care.

If the health officer finds a violation, the itinerant medical provider or operator can seek an administrative hearing before the health officer or his or her designee, whose ruling can be appealed to the board of health. Violations are subject to injunctive relief and fines of $1,000 per violation, as well as costs, damages, and attorney fees. Any finding of violation must be sent to the Indiana State Medical Licensing Board.

Dr. Ulrich Klopfer and Fort Wayne Women's Health bring this suit to enjoin application of the ordinance against them. Dr. Klopfer is an itinerant medical provider, Fort Wayne Women's Health is an "operator" as defined by the ordinance, and surgical abortions performed there are "medical care" within the ordinance's definition.

Dr. Klopfer, who has an unlimited license issued by the Indiana State Medical Licensing Board to practice medicine in Indiana, owns and operates Fort Wayne Women's Health, an abortion clinic located in Fort Wayne and licensed by the state department of health. Fort Wayne Women's Health is the only clinic for 100 miles where surgical abortions are performed. Roughly a third of the women seeking abortion services from Fort Wayne Women's Health are from outside Allen County. Fort Wayne Women's Health complies with state requirements for abortion clinics.

People feel strongly about the abortion issue. Dr. Klopfer has been shot at and knows of violence that has been directed at other doctors who perform abortions. Dr. Klopfer tried to find a physician designee, but because of the

controversial nature of abortions and because the physician designee's name will be distributed, he couldn't obtain a designee.

Before the original ordinance was to go into effect, Dr. Klopfer paid his $250 fee to the county health department and gave the required information for Fort Wayne Women's Health and himself. He was told he couldn't get a certificate of compliance because he didn't list a physician designee. Dr. Klopfer explained that he was available in case of emergencies twenty-four hours a day, seven days a week, 365 days a year. A certificate of compliance was then issued to Dr. Klopfer.

Dr. Klopfer had to disclose his home address on the county's application form. Doing so troubled Dr. Klopfer, who keeps his address out of the public domain. He would like to have all references to his home address in the county's possession extinguished. Dr. Klopfer has received a threatening communication since he filed this case. Dr. Klopfer also was given a set of fax numbers of facilities to which he must send his emergency contact information, including his cell phone number. He hasn't complied with this branch of the ordinance. He gives his number to patients, but doesn't want it publicly disseminated; his cell number, if widely known, would become another avenue for threats and harassment.

Dr. Klopfer's patients often ask for assurances that their abortion records will be kept confidential. His experience leads him to believe patients receiving abortions have greater privacy concerns than recipients of most other medical procedures, making it essential that he be able to assure his patients that their

records and identities will remain private. Patients might be reluctant to seek and obtain abortions if privacy and confidentiality aren't assured.

From this point forward in the opinion, the court lumps both plaintiffs together as "Dr. Klopfer" since he owns Fort Wayne Women's Health and both plaintiffs' positions are identical. Dr. Klopfer filed a four count complaint alleging:

1. The ordinance violates the Indiana Home Rule Act, IND. CODE §§ 36-1-3-1 *et seq.*;

2. The ordinance violates the United States Constitution's Fourth Amendment right against unreasonable searches, and the similar right in the Indiana Constitution, Art. I § 11;

3. The ordinance violates the Fourteenth Amendment right against invasion of informational privacy; and

4. The ordinance violates the Fourteenth Amendment right to due process because it is an irrational law.

Dr. Klopfer filed a motion for preliminary injunction, raising the first three claims from the complaint as the basis for the preliminary injunction. The defendant Board of Commissioners filed a motion to dismiss all four claims.

## II. MOTION FOR PRELIMINARY INJUNCTION

The plaintiffs filed an amended motion for preliminary injunction, on the basis of their amended complaint, to enjoin enforcement of the ordinance in its present form. Dr. Klopfer's argument involves his first three claims, regarding

Indiana's Home Rule Act, the Fourth Amendment to the United States Constitution and Art. I § 11 of the Indiana Constitution, and the United States Constitution's Fourteenth Amendment right to informational privacy.

## A. Standard

To justify a preliminary injunction, Dr. Klopfer must show four elements: (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without the injunction, (3) the harm he would suffer without the injunction is greater than the harm the injunction would inflict on the defendant, and (4) the injunction is in the public interest. Judge v. Quinn, No. 09-2219, 2010 WL 2652204, at *7 (7th Cir. June 16, 2010) (*citing* Winter v. Natural Res. Def. Council, Inc., --- U.S. ---, ---, 129 S. Ct. 365, 374 (2008)).

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (*quoting* 11A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2948, pp. 129-130 (2d ed. 1995)). Accordingly, there must be more than a mere possibility of irreparable harm and the plaintiffs must "demonstrate that irreparable injury is likely in the absence of an injunction." Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. at 375-376.

Our court of appeals emphasizes, as do the plaintiffs in this case, that "[t]hese considerations are interdependent: the greater the likelihood of success

on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." <u>Judge v. Quinn</u>, 2010 WL 2652204, at *7. Likewise, "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be." <u>Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.</u>, 582 F.3d 721, 725 (7th Cir. 2009). The Board of Commissioners correctly points out that even with the sliding scale between probability of success on the merits and degree of harm, Dr. Klopfer must surpass the "possibility" threshold into "likelihood" on each prong: it must be likely that he will succeed on the merits and it must be likely that he will suffer irreparable harm in the absence of an injunction; the sliding scale doesn't remove the burden of this likelihood threshold from Dr. Klopfer. *See* <u>Winter v. Natural Res. Def. Council, Inc.</u>, 129 S. Ct. at 375 ("We agree with the Navy that the Ninth Circuit's 'possibility' standard is too lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction."); *see also* <u>Nken v. Holder</u>, --- U.S. ---. ---, 129 S. Ct. 1749, 1762 (2009) (discussing similar standards for issuance of stay and noting that the "possibility" standard for success on the merits and irreparable harm is too lenient). "Likely" means more than "better than negligible" and "more than a mere possibility of relief." <u>Nken v. Holder</u>, 129 S. Ct. at 1761.

*B. Indiana's Home Rule Act*

The question of how Indiana's Home Rule Act applies in this case requires the court to predict how the Indiana Supreme Court would address this situation. To the extent the Indiana Supreme Court hasn't explored the contours of the Home Rule Act that govern this case, the court looks to the Indiana courts of appeals for guidance, unless a compelling reason exists to doubt that those courts decided Home Rule Act cases correctly. <u>Home Valu, Inc. v. Pep Boys</u>, 213 F.3d 960, 963 (7th Cir. 2000); <u>Klunk v. County of St. Joseph</u>, 170 F.3d 772, 777 (7th Cir. 1999).

The old Dillon Rule used to control questions of local authority vis-a-vis state authority in Indiana and elsewhere. The Dillon Rule limited local powers to express statutory grants of authority and powers necessarily or fairly implied by those grants of authority. The Dillon Rule had a rule of construction that resolved cases of reasonable doubt about a local authority's power against the local authority's exercise of that power. <u>Tippecanoe County v. Indiana Mfr's. Ass'n</u>, 784 N.E.2d 463, 465 (Ind. 2003) (discussing history of application of Dillon Rule in Indiana and quoting DILLON, MUNICIPAL CORPORATIONS (1st ed. 1872)).

The Home Rule Act of 1980, IND. CODE §§ 36-1-3-1 *et seq.*, completely abrogated and reversed the Dillon Rule. *See* IND. CODE § 36-1-3-4(a). Indiana's policy now is "to grant units all the powers that they need for the effective operation of government as to local affairs." IND. CODE § 36-1-3-2. A county is a "unit." IND. CODE § 36-1-2-23. After passage of the Home Rule Act, a unit such as Allen County has "(1) all powers granted it by statute; and (2) all other powers

necessary or desirable in the conduct of its affairs, even though not granted by statute." IND. CODE § 36-1-3-4(b). That a state statute doesn't grant a power "does not imply that units lack that power." IND. CODE § 36-1-3-4(c). The rule of construction now is that "[a]ny doubt as to the existence of a power of a unit shall be resolved in favor of its existence." IND. CODE § 36-1-3-3(b); *see also* City of Carmel v. Martin Marietta Materials, Inc., 883 N.E.2d 781, 784 (Ind. 2008) (discussing Home Rule Act); City of North Vernon v. Jennings Northwest Reg'l Utils., 829 N.E.2d 1, 4-5 (Ind. 2005) (discussing Home Rule Act); Tippecanoe County v. Indiana Mfr's. Ass'n, 784 N.E.2d at 465-466 (discussing history of Dillon Rule and its abrogation by the Home Rule Act). The net result is that "a unit may exercise any power it has to the extent that the power: (1) is not expressly denied by the Indiana Constitution or by statute; and (2) is not expressly granted to another entity." IND. CODE § 36-1-3-5(a).

The Indiana Supreme Court has construed the Home Rule Act very broadly, stating "[w]e believe this statutory scheme demonstrates a legislative intent to provide counties, municipalities, and townships with expansive and broad-ranging authority to conduct their affairs." City of Carmel v. Martin Marietta Materials, Inc., 883 N.E.2d at 784 (*quoting* City of North Vernon v. Jennings Northwest Reg'l Utils., 829 N.E.2d at 5).

The Home Rule Act doesn't grant unlimited powers to local units. Two limitations on Allen County's power are relevant here. First, "[i]f there is a constitutional or statutory provision requiring a specific manner for exercising a

power, a unit wanting to exercise the power must do so in that manner." IND. CODE § 36-1-3-6(a). The court will address constitutional limitations on Allen County's power in this case when it addresses the plaintiffs' remaining claims.

Second, the Home Rule Act expressly denies units "[t]he power to regulate conduct that is regulated by a state agency, except as expressly granted by statute." IND. CODE § 36-1-3-8(a)(7). "'Regulate' includes license, inspect, or prohibit." IND. CODE § 36-1-2-15. Indiana courts have interpreted this provision, in light of the language and policy of the Home Rule Act as a whole, to mean that in areas regulated by state agencies, a local government may "impose additional, reasonable regulations, and . . . supplement burdens imposed by non-penal state law, provided the additional burdens are logically consistent with the statutory purpose." Indiana Dep't of Natural Res. v. Newton County, 802 N.E.2d 430, 433 (Ind. 2004) (quoting Hobble v. Basham, 575 N.E.2d 693, 697 (Ind. Ct. App. 1991). "An impermissible conflict with state law will be found if the Ordinance seeks to prohibit that which a statute expressly permits." Indiana Dep't of Natural Res. v. Newton County, 802 N.E.2d at 433.

This court's review of the case law indicates that courts have looked to two overlapping questions to determine whether the state regulation preemption provision acts to preempt a local authority's exercise of power. First, does the State regulate the specific conduct in question? This is a narrow question, confined in the cases to two overlapping sub-inquiries: (a) Is the local authority's specific regulation duplicative of the state's specific regulation and therefore

preempted by the state's regulation? (b) Is the local regulation in direct conflict with the state's specific regulation so that persons couldn't possibly obey both the state's and the local authority's regulation? Second, is the local authority's regulation logically consistent with state policies expressed in state statutes?

This inquiry shines through all the dicta in <u>Sisters of St. Francis Health Servs., Inc. v. Morgan County, Ind.</u>, 397 F. Supp. 2d 1032 (S.D. Ind. 2005).[1] Indiana had adopted a policy of free market competition among hospitals. Morgan County was concerned about protecting the market share and financial viability of its county-run Morgan Hospital & Medical Center. The Sisters of St. Francis Health Services, Inc. ran the only other hospital in the county. St. Francis began planning a $40 million expansion of its hospital, but the county took the protectionist approach of passing an ordinance that imposed a moratorium on, among other things, the construction of new hospital facilities for the remainder of 2005. Afterward, the ordinance required the commissioners to approve construction of such facilities. St. Francis declined to seek an exception to the ordinance and, instead, attacked the facial validity of the ordinance because its fund-raising abilities would be in question as long as it was doubtful whether it could build its entire proposed project. <u>Id.</u> at 1035-1041.

---

[1]      Dr. Klopfer relies heavily on this case to support his argument that Allen County can't regulate in an area related to abortion because the state already heavily regulates this area. The court approaches the case with the caution that it was decided by a federal district court and not by an Indiana appellate court, so the case is therefore only persuasive and not authoritative to this court, especially if it contradicts Indiana court analyses. But the case is consistent with Indiana court analyses, so the court finds the case persuasive to illustrate the line of inquiry it finds in the cases dealing with the state regulation preemption provision.

The St. Francis court found that "St. Francis has shown that the state agency regulates the same conduct that the Morgan County Ordinance attempts to regulate: the construction of new and expanded hospital facilities." Id. at 1054. The court spoke about the breadth of state regulation of hospitals. But it was the county's attempt to prohibit, and then require permission for, the construction of new hospital facilities that contradicted both the Department of Health's authority to issue licenses to new hospitals and the detailed Indiana statutes regulating the decision to construct a new hospital. The court also found that the ordinance served a purpose of restricting competition among hospitals, which was "not merely different from the state regulations and policy, but [was] flatly contrary to the express state policy of promoting competition" among hospitals. Id. at 1055. As a result, the ordinance wasn't logically consistent with the state's statutory goals. Id. Dr. Klopfer argues that St. Francis teaches that the breadth of Indiana State health regulations, by itself, prevents counties from issuing their own health regulations. To the contrary, the lesson of St. Francis is that county regulations must not directly contradict state regulations regarding specific conduct and must not contradict state policies.

Hobble v. Basham, 575 N.E.2d 693 (Ind. Ct. App. 1991), is often quoted for the proposition that, under the Home Rule Act,

> In construing the statute or ordinance, all doubts are to be resolved against the challenger and, if possible, the ordinance is to be construed as valid. An impermissible conflict with state law will be found if the Ordinance seeks to prohibit that which a statute expressly permits. If the state has not chosen to occupy an area to

the exclusion of municipal regulation, a City may impose additional, reasonable regulations, and may supplement burdens imposed by non-penal state law, provided the additional burdens are logically consistent with the statutory purpose.

575 N.E.2d at 697 (citations omitted). <u>Hobble</u> demonstrates the overlapping nature of the questions already articulated, and it also demonstrates the narrowness of the regulatory preemption inquiry. New Albany required ice cream trucks selling ice cream on streets to, among other things, display alternating flashing red lights from the front and rear of the truck. Indiana statutes prohibited flashing lights except, among other things, to indicate "the presence of a vehicular traffic hazard requiring unusual care in approaching, overtaking or passing." <u>Id.</u> (*quoting* IND. CODE § 9-8-6-29). Stopped ice cream trucks selling ice cream to young children were such hazards, but Indiana statutes required the front lights on such hazards to flash simultaneously in a color somewhere between white and amber. <u>Id.</u> at 698 (*quoting* IND. CODE § 9-8-6-22). The New Albany ordinance directly conflicted with the state statutes because it required something specifically different from what the state statutes required for front-facing flashing lights on ice cream trucks. <u>Id.</u> The court focused its decision on the direct conflict at issue, but also noted that "[t]o the extent that a purpose can be discerned in the statutes, it is clear the legislature intended to ensure a uniform system of lights . . . so that emergency vehicles could be easily distinguished from other vehicles." <u>Id.</u> The ordinance wasn't logically consistent with that statutory purpose because it directly frustrated that purpose.

Lex, Inc. v. Board of Trustees of the Town of Paragon, 808 N.E.2d 104 (Ind. Ct. App. 2004), illustrates a valid stricter regulation imposed on top of state law requirements. The Indiana Department of Health licensed mobile home parks, including one owned by Lex, Inc. Paragon amended its ordinance in 2002 to require everyone moving mobile homes into Paragon to have a license issued by the town's Board. The ordinance restricted mobile homes that were five years old or older at the time of license application from moving into the town. Id. at 106. The Board's concern in enacting the Ordinance was health and sanitary considerations. Id. at 109. The court rejected Lex's argument that the town of Paragon couldn't issue this regulation because the State Department of Health issued licenses to mobile home parks. The court found simply, "It is through the Ordinance that the Board is enforcing the Health Department's sanitary and safety regulations, not seeking to exceed its authority." Id. at 110. Two implications follow from this. First, even though the ordinance prohibited something implicitly (but not expressly) allowed by state regulation, the ordinance didn't contradict any statutes or the Health Department's regulations because it didn't allow something prohibited by the state statutes. Second, the ordinance furthered the Health Department's policies of ensuring sanitary and safe conditions in mobile home parks.

In Hopkins v. Tipton County Health Dep't, 769 N.E.2d 604 (Ind. Ct. App. 2002), Tipton County amended its ordinance regulating sewage systems to require installers of private sewage disposal systems to be licensed. Id. at 606. The State

Health Department already had established "the standards for the design, construction, installation, maintenance, and operation of residential sewage disposal systems including permit and inspection requirements." Id. at 609. But the state didn't regulate the licensing of system installers. Tipton County's trouble was that its amended ordinance allowed the County Board to revoke an installer's license only "for failure to observe the standards established by this Ordinance or upon conviction of a violation of this Ordinance." Id. The ordinance didn't reference the Health Department's regulations as a basis for license revocation and so was invalid because the Health Department's regulations must be the standard by which licensing could be measured. To the extent the county didn't bind itself to those standards as a minimum baseline, its ordinance went awry. Theoretically, Tipton County could have bound itself to the State's regulations and imposed additional stricter regulations, as in Lex, Inc., but the county didn't make any reference to the State's regulations at all.

Dr. Klopfer argues three things: (1) to the extent the ordinance affects an abortion clinic, the area it regulates is already extensively regulated by the Department of Health, *see* IND. CODE §§ 16-21-2-2.5; 410 IND. ADMIN. CODE 26-1-1 *et seq.*; (2) the state hasn't expressly granted Allen County the authority to regulate in this area; and (3) the ordinance is neither reasonable nor logically consistent with state law and actually contradicts the Department of Health's abortion clinic regulations.

The Indiana cases discussed, for example <u>Hobble v. Basham</u>, demonstrate that it isn't enough for plaintiffs to show that the state regulates an area extensively. There is no showing that Indiana law expressly prohibits Allen County from enacting further regulations in the medical field. Even though no statute appears to grant Allen County express power to enact additional medical regulations like this ordinance, Allen County can enact additional medical regulations so long as those regulations don't contradict existent state regulations. *See* IND. CODE §§ 36-1-3-4(b) and 36-1-3-4(c). If the ordinance doesn't directly conflict with state law, and "provided the additional burdens are logically consistent with the statutory purpose," it is valid under the Home Rule Act. <u>Hobble v. Basham</u>, 575 N.E.2d 693, 697 (Ind. Ct. App. 1991).

The heart of Dr. Klopfer's argument is that the ordinance's requirements are in direct conflict with state law requirements. As the cases illustrate, to be in "conflict" within the meaning of the Home Rule Act the ordinance must be precise in its contravention of statutory (or, in this case, Health Department regulatory) mandate or it must otherwise frustrate the policies found in state laws. If the ordinance can exist with the state regulations and doesn't otherwise contravene state or constitutional law, it is valid. The court leaves aside the constitutional questions for the moment.

Dr. Klopfer argues that state regulations allow disclosure of patient records only in accord with state and federal law and only to authorized individuals. *See* 410 IND. ADMIN. CODE 26-7-1(b)(7). He argues that the health commissioner and

others who would review patient notification forms aren't authorized by state or federal law to do so and so aren't "authorized persons." This isn't a contradiction. The regulation states:

> The clinic shall ensure the confidentiality of patient records. The clinic must develop, implement, and maintain the following:
> (A) A procedure for releasing information or copies of records only to authorized individuals in accordance with federal and state laws.
> (B) A procedure that ensures that unauthorized individuals cannot gain access to medical records.

410 IAC 26-7-1(b)(7). The regulation doesn't facially define "authorized individuals" as limited to express authorizations found in federal and state laws. To the extent the Home Rule Act allows Allen County to regulate the medical field, Indiana law thereby widens the scope of authorization to Allen County officials. The ordinance doesn't contradict the regulation by authorizing Allen County officials to view patient records.

Dr. Klopfer argues further that the state regulations require instructions for emergencies to be given to patients or patients' legal representatives and require discharge information to be given to patients or patients' legal representatives, but the ordinance requires the patient to receive the doctor's emergency contact information before a procedure. There is no contradiction in these requirements: itinerant medical providers can give patients their emergency contact information before procedures while still complying with the State's regulations.

Finally, Dr. Klopfer argues that state regulations require all medical personnel interacting with patients to meet certain qualifications, but the

ordinance imposes no substantive requirements on physician designees, except that they be willing to be designated and not be an itinerant medical provider. There is no direct contradiction shown here because while the definition of physician designee may be vague on physician qualifications, the ordinary meaning of the term would suggest that these are standby doctors who, not being itinerant medical providers, can be called in the event that the emergency number for the itinerant medical provider isn't getting through to him or her. The ordinance doesn't permit what the state prohibits here, Indiana Dep't of Natural Res. v. Newton County, 802 N.E.2d at 433, so if the state's regulations of physicians have any applicability to physician designees, then they presumably would still apply to physician designees under the ordinance.

In short, what isn't forbidden is permitted under the Home Rule Act. There is no statutory prohibition preventing a unit such as Allen County from enacting additional reasonable regulations that are logically consistent with state regulations. There is no direct contradiction shown between the requirements of state law and the local ordinance: itinerant medical providers can comply with both in harmony. If there is any remaining doubt left here, it is to be resolved in favor of ordinance's validity. IND. CODE § 36-1-3-3(b). Dr. Klopfer is not likely to prevail on his Home Rule Act claim.

*C. Fourth Amendment Search*

Dr. Klopfer points out that the ordinance creates a duty for Allen County health officials to review patient notification forms, and he argues that this will result in unconstitutional searches under the Fourth Amendment to the United States Constitution and Article I, § 11 of the Indiana State Constitution. Though Indiana analyzes its search and seizure provision in a way that is distinct from the Fourth Amendment analysis, *see* Linke v. Northwestern School Corp., 763 N.E.2d 972, 977 (Ind. 2002), no party has argued that the Indiana Constitution applies in a way that would produce a different result from the Fourth Amendment analysis. The court's analysis here focuses on the Fourth Amendment.

The ordinance mandates that the health officer "shall" conduct a review of various items after receiving a "credible complaint," including the written patient notifications of emergency contact information. Amended Ordinance § 10-8-6(B). These notifications evidence patients' receipt of the itinerant medical provider's and physician designee's emergency contact information, which the ordinance requires patients to sign and medical providers to keep on file as a permanent record. Amended Ordinance § 10-10-2(A)(3). Dr. Klopfer argues that this provision mandates a search of private patient information regardless of whether a medical provider consents to the search. Dr. Klopfer's concern is that such a search would needlessly invade his patients' privacy and his refusal of consent to a search could be seen as a violation of the ordinance, resulting in a fine. *See* Amended Ordinance § 10-8-6(A) ("Violations shall include but not be limited to . . . ."). The commissioners say the ordinance imposes a duty on the health officer to conduct

a search, but it doesn't impose a corollary duty on the medical providers to consent to a search, so a refusal of consent wouldn't violate the ordinance. The commissioners say that in the absence of consent, the ordinance grants the Health Officer authority to seek a subpoena for reviewing the patient notification forms or for obtaining testimony about those forms. *See* Amended Ordinance § 10-8-6(B).

The Fourth Amendment states, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated," and warrants shall issue only upon probable cause. U.S. CONST. amend. XIV. The basic purpose of the Fourth Amendment is "to safeguard the privacy and security of individuals against arbitrary invasions by government officials," and the amendment protects against government intrusions in civil as well as criminal investigations. Doe v. Heck, 327 F.3d 492, 509 (7th Cir. 2003) (*quoting* Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523, 528 (1967), and *citing* Marshall v. Barlow's, Inc., 436 U.S. 307, 312 (1978)).

The health commissioner's perusal—on private property—of emergency contact notification forms signed by medical patients would be a "search." *See* Doe v. Heck, 327 F.3d at 510 ("The defendant caseworkers' investigation [of child abuse] on Greendale's [a private school] premises easily meets this definition because the defendants went to the school for the specific purpose of gathering information, an activity that most certainly constitutes a search under the Fourth Amendment.").

Not all searches are unreasonable. A consented search is reasonable, and a judicially authorized search is reasonable. *See, e.g.*, Camara v. Municipal Court, 387 U.S. at 528-529 ("[O]ne governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." (citations omitted)). The Allen County ordinance authorizes county health officials to seek a subpoena from the county circuit or superior court. Presumably, the local court would issue a subpoena, if ever, in harmony with constitutional standards, which would take into account the difference between criminal investigations and an administrative search of medical records, including a more robust expectation of privacy and more robust respect for privacy in medical records. *See* Camara v. Municipal Court, 387 U.S. at 538; *see also* discussion *infra* (concerning Fourteenth Amendment informational privacy rights).

The question then becomes whether the health officer's search, if done without consent or a subpoena, would be reasonable. Courts answer this question by balancing the degree to which the search would intrude upon an individual's privacy and the degree to which it is needed for the promotion of legitimate governmental interests. Doe v. Heck, 327 F.3d at 510. Searches conducted on private property are presumptively unreasonable, and that presumption applies whether the government is motivated by investigation of criminal activity or by potential breaches of statutory or regulatory standards. Id. at 511 (*quoting*

<u>Marshall v. Barlow's, Inc.</u>, 437 U.S. at 312-313). The key is the individual's legitimate expectation of privacy. <u>Doe v. Heck</u>, 327 F.3d at 511 (*citing* <u>Minnesota v. Carter</u>, 525 U.S. 83, 88 (1998)). "A reasonable expectation of privacy exists when: (1) the claimant exhibits an actual (subjective) expectation of privacy; and (2) the expectation is one that society is prepared to recognize as reasonable." <u>Doe v. Heck</u>, 327 F.3d at 511.

Medical patients have an actual expectation of privacy in their medical records and society sees this expectation as reasonable. *See* discussion *infra* (concerning Fourteenth Amendment right to informational privacy in medical records). Unconsented or non-judicially-sanctioned entry onto a private medical facility's property to conduct a search of medical records would be unreasonable under the Fourth Amendment.

The facial language of the ordinance is ambiguous about whether it mandates an unconsented search of patient notification forms at Dr. Klopfer's facility, or whether it requires the health officer to obtain a subpoena in the absence of consent to search. The ordinance only states that "the Health Officer shall conduct a review" of, among other things, signed patient notification forms. Amended Ordinance § 10-8-6(B).

Dr. Klopfer insists his Fourth Amendment challenge is an as-applied challenge. The Board of Commissioners argues that the challenge isn't ripe because no search has occurred yet, so Dr. Klopfer's challenge must be considered a facial Fourth Amendment challenge to the ordinance, which courts disfavor. The

distinction makes no difference here. Without a subpoena, unconsented searches of patient records would be unconstitutional. Because the case law is so developed on this question, no government official would be entitled to qualified immunity in a § 1983 suit if he or she conducted such an unconsented search. *See* <u>Doe v. Heck</u>, 327 F.3d at 517 ("At this juncture, however, we now make it clear that it is patently unconstitutional for government officials to search the premises of a private or parochial school and/or seize a child attending that school without a warrant or court order, probable cause, consent, or exigent circumstances."); *see also* <u>Camara v. Municipal Court</u>, 387 U.S. at 528-529 (stating that search of private property without proper consent is unreasonable unless authorized by valid search warrant). Though the ordinance might be read as providing an instruction to conduct an unconstitutional search, it is appropriate to presume that government officials in Allen County will apply the ordinance in a constitutional manner and obtain either consent or a subpoena before undertaking a search of patient notification forms. *See, e.g.,* <u>United States v. Ramsey</u>, 503 F.2d 524, 530-531 (7th Cir. 1974) (noting that normal application of statute wouldn't ordinarily lead to Fourth Amendment violations and that unconstitutional applications of the statute were inhibited by other protections). In the absence of an actual unconstitutional search, Dr. Klopfer is unlikely to succeed on his Fourth Amendment claim.

*D. Fourteenth Amendment Informational Privacy*

The ordinance allows county health officials access to patient notification forms that contain only patient signatures. The ordinance also allows the communication of patient-identifying information to the Indiana State Medical Licensing Board. Dr. Klopfer argues this unconstitutionally invades patients' privacy. The Board of Commissioners argues that it isn't unconstitutional in itself for government officials to view patient medical records. The Board also argues that confidentiality requirements in the ordinance prevent patient medical information from being disseminated beyond government health officials. The ordinance states, "Any documents in the custody of the Department or its employees, or the Health Officer or his or her designee, or the Board of Health, containing information about Patients shall not be disclosed to the public if otherwise prohibited by law." Amended Ordinance § 10-10-13(A). Dr. Klopfer argues that this is a very big "if." Also, he points out, virtually all types of patient identifying information may be provided to the Indiana State Medical Licensing Board. *See* Amended Ordinance § 10-10-13(A)(1)-(10).

The Board responds that HIPAA imposes confidentiality requirements on the patients' notification forms, but Dr. Klopfer replies, without further response from the Board, that HIPAA doesn't apply to Dr. Klopfer's practice. The Board also responds that Indiana law makes it a crime for public officials to disseminate confidential documents and that medical records are confidential. Dr. Klopfer replies that the Indiana statute doesn't clearly define patient records as confidential. The Board further argues that the Indiana statute doesn't use

"confidential" as a term of art and that common sense would indicate that medical records are to be considered confidential under Indiana statute.

Our court of appeals has unambiguously recognized a Fourteenth Amendment due process right for individuals to avoid disclosure of personal matters, which "includes a qualified constitutional right to the confidentiality of medical records and communications." Coffman v. Indianapolis Fire Dep't, 578 F.3d 559, 566 (7th Cir. 2009) (*citing* Whalen v. Roe, 429 U.S. 589, 599 (1977); *see also* Denius v. Dunlap, 209 F.3d 944, 955 (7th Cir. 2000); Anderson v. Romero, 72 F.3d 518, 522 (7th Cir. 1995)). Courts have yet to formalize a structure for judging alleged violations of the right of confidentiality in medical records. *See* Coffman v. Indianapolis Fire Dep't, 578 F.3d at 566 (noting "we have never articulated the precise test for an alleged violation of the right of confidentiality" and declining to do so just yet).

Courts weighing such claims have balanced the nature and extent of the invasion of privacy against the government's interest in the medical information it seeks. *See* Coffman v. Indianapolis Fire Dep't, 578 F.3d at 566 (noting that government's interest in ensuring both physical and mental well-being of firefighting force, necessitating disclosure of plaintiff's medical records, was "compelling"); Anderson v. Romero, 72 F.3d at 522 (noting that disclosure of inmate's HIV status to other inmates doesn't violate privacy rights because of government's interest in preventing further communication of the disease within the prison setting).

The seminal case on this issue, <u>Whalen v. Roe</u>, 429 U.S. 589 (1977), undertook this balancing of patient privacy and government need for information. In <u>Whalen</u>, New York State promulgated a centralized data system to track medical patients receiving potentially dangerous prescription drugs to deter and investigate overprescription and excessive use of the drugs. Copies of prescription forms were to be kept in a vault for five years; the vault was in a room surrounded by a locked wire fence and protected by an alarm system; computer tapes were kept in a locked cabinet; the computer was unplugged from the computer network when tapes were used; public disclosure of the identity of patients was expressly prohibited by statute and willful violation of this prohibition was a crime punishable by up to one year in prison; and a limited number of government personnel would ever have access to the medical records. <u>Id.</u> at 595. Medical patients were concerned about the potential release of their information, and evidence showed that some patients would decide not to receive necessary treatment out of fear of the stigma that could arise if their names were associated with these drugs. <u>Id.</u>

The <u>Whalen</u> Court held that the real and potential impact of New York's scheme on patients' privacy didn't constitute an invasion of constitutional rights under the Fourteenth Amendment. <u>Id.</u> at 603-604. In reaching its decision, the Court noted the scheme was the product of a "rational" legislative decision and there was nothing "unreasonable" about assuming that the identification of patients would help enforce laws designed to minimize the misuse of certain

dangerous drugs. Id. at 597-598.The state had a "vital interest" in controlling the distribution of these drugs. Id. at 598. There was no basis to assume that the scheme's strong security provisions would be mismanaged. Id. at 600-602. The Court noted that these patients' medical information was already in the hands of many people—doctors, hospitals, insurance companies, and public health agencies—so disclosures to representatives of the State who were responsible for community health didn't automatically amount to an unconstitutional invasion of privacy. Id. at 602. The alleged chilling affect on persons seeking medical treatment was, on the evidence before the Court, minimal. Id. at 602.

Although the Whalen Court carefully limited its holding to the facts before it, id. at 605-606, Whalen is instructive in showing a fact-intensive balance between individual interest in medical privacy and government interest in promoting community health. See Denius v. Dunlap, 209 F.3d 944, 956 (7th Cir. 2000) ("Furthermore, while it is apparent that some form of balancing test would be used to determine when this right of confidentiality has been violated, that test has not been defined in this Circuit.")[2]. As noted already, our court of appeals hasn't formally adopted a test, but it has noted that,

> A number of our sister circuits have adopted a variation of the balancing test articulated by the Third Circuit that includes: 1) "the

---

[2]     The Denius court summarized the Whalen Court's balance of factors as: "1) the potential for public disclosure of the information; 2) the extent to which the private information is already disclosed to other individuals or institutions; 3) the similarity of the disclosure in question to disclosures that have already taken place; 4) the potential deterrent effect on the exercise of other constitutional liberties; and 5) the state's interest in the information." Denius v. Dunlap, 209 F.3d at 956 n. 7 (citing Whalen v. Roe, 429 U.S. at 601-604).

type of record requested"; 2) "the information it does or might contain"; 3) "the potential for harm in any subsequent nonconsensual disclosure"; 4) "the injury from disclosure to the relationship in which the record was generated"; 5) "the adequacy of safeguards to prevent unauthorized disclosure"; 6) "the degree of need for access"; 7) "whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access."

Denius v. Dunlap, 209 F.3d at 956 n.7 (*quoting* United States v. Westinghouse Elec. Corp., 638 F.2d 570, 578 (3d Cir. 1980)).

The Board of Commissioners voiced concern about patients entering emergency rooms while suffering complications from surgeries performed by itinerant medical providers, noting that sometimes these patients' original doctors can't be reached in emergency situations. The Board wanted to ensure that everyone—patients and doctors—has the emergency contact information for these itinerant medical providers and their physician designees. To ensure that patients receive this contact information, the ordinance requires itinerant medical providers to have patients sign a patient notification form that would be kept as a permanent record. As Dr. Klopfer concedes, the health of its citizenry is undoubtedly a rational interest for Allen County. As in Whalen, the court accepts that health is a "vital" government interest.

But Dr. Klopfer's concern is that although patient notification forms would contain only a patient signature, the forms would easily allow the connection of a patient name on an abortion clinic's notification form with a surgical abortion. This, they argue, will unnecessarily invade patients' privacy and will cause a chilling effect on patients seeking medical services from Dr. Klopfer. Dr. Klopfer

is further concerned that the ordinance's privacy provision offers no real protection of patients' privacy.

The ordinance's purpose is to ensure communication and peer review between Allen County medical providers and itinerant medical providers in emergency situations. *See* Amended Ordinance, Preamble. The ordinance seeks to achieve this purpose by requiring the itinerant medical providers to give other medical providers and their patients their around-the-clock phone numbers. To the extent the purpose is to ensure communication between doctors, it isn't clear how much of a need there is for patients to sign a form, which government officials might discover sometime in the future, to foster communication between doctors, particularly if a patient is unconscious in an emergency room. This calls into question the need for county health officials to leaf through medical records or files containing these signed forms to ensure compliance with the ordinance and the need to send unredacted patient identifying information to the Indiana State Medical Licensing Board.

Further, far different from <u>Whalen</u>, the security measures in the ordinance assuring the confidentiality of patient identifying information are vague at best. The Board points out that Indiana law makes it a crime for a "public employee, a public official, or an employee or officer of a contractor or subcontractor of a public agency" knowingly to disclose information classified as confidential by state statute. IND. CODE § 5-14-3-10(a). This provides little comfort to medical patients since it isn't immediately obvious whether Indiana statutes define medical records

32

as confidential. *See* IND. CODE §§ 5-14-3-4(a)(1); 5-14-3-4(a)(9). The ordinance's privacy regulation states that "documents . . . containing information about Patients shall not be disclosed to the public if otherwise prohibited by law." Amended Ordinance § 10-10-13A. The court is in the dark about what laws, federal or state, "otherwise prohibit[]" disclosure of patient information to the public under this ordinance. The Board argues that the term "confidential" in the statute isn't a term of art, and common sense indicates that medical records are confidential within the meaning of the statute. No authority is before the court to confirm the Board's reading of the statute.

Because of what currently appears to be a mismatch between the ordinance's goals and the requirement for and inspection of patient notification forms containing patient identifying signatures, and the vague confidentiality provisions of the ordinance, it appears at this stage that Dr. Klopfer is likely to succeed on the merits of his Fourteenth Amendment informational privacy claim.

## *E. Remaining Preliminary Injunction Factors*

Because Dr. Klopfer is likely to succeed only on the Fourteenth Amendment informational privacy claim, the preliminary injunction inquiry is now limited to that claim. Violations of constitutional rights inflict irreparable harm. *See* Campbell v. Miller, 373 F.3d 834, 840 (7th Cir. 2004) ("In other words, Campbell can establish the irreparable harm element by demonstrating a violation of his constitutional rights."). The harm Dr. Klopfer will suffer from the violation of

informational privacy rights outweighs any harm to the county if the county is enjoined from requiring patient notification forms and from providing unredacted patient information to the Indiana State Medical Licensing Board. The public interest is best served through the protection of constitutional rights.

## F. Preliminary Injunction Issued

For the reasons stated, the court will order a preliminary injunction preventing the Board of Commissioners from enforcing provisions in the ordinance that have to do with patient notification forms and the provision of patient identifying information to the Indiana State Medical Licensing Board. The ordinance is severable, *see* Amended Ordinance § 10-10-15, and can be applied to achieve its purpose after severance of these provisions.

## II. MOTION TO DISMISS

The Board of Commissioners moved to dismiss all four counts of the complaint. When reviewing the Board of Commissioner's motion to dismiss, "all well-pleaded facts are accepted as true, and all reasonable inferences are drawn in the plaintiff's favor." George v. National Collegiate Athletic Ass'n, No. 09-3667, 2010 WL 2788452, at *2 (7th Cir. July 16, 2010). "The allegations in the complaint 'must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself

out of court.'" Id. (*quoting* Equal Employment Opportunity Comm'n v. Concentra Health Servs., Inc., 496 F.3d 773, 776 (7th Cir. 2007)).

The Board argues that its motion to dismiss should be granted on the Home Rule Act claim because, it says, the lack of likelihood of success for Dr. Klopfer on this claim translates into "a complete failure" to state a claim. This isn't so. Though the court finds at this stage that Dr. Klopfer isn't likely to succeed on the Home Rule Act claim, that doesn't preclude a finding that he has stated a claim that is more than speculative. Similarly, although Dr. Klopfer isn't likely to succeed on the Fourth Amendment claim, such a finding doesn't equate with finding the claim to be only speculative. The Board hasn't shown that either the Home Rule Act claim or the Fourth Amendment claim is purely speculative. Because the court finds that Dr. Klopfer is likely to succeed on the Fourteenth Amendment informational privacy claim, that claim clearly rises above the speculative level.

The Board argues that because Dr. Klopfer hasn't pursued his fourth claim—the constitutional irrationality of the physician designee requirement—in the preliminary injunction motion, the court should dismiss that claim. The claim is stated in the complaint, whether it's a basis for the plaintiffs' preliminary injunction argument or not. Further, the Board argues that it is completely rational to pursue the state's interest in protecting the health of medical patients. This is true, but Dr. Klopfer argues that the way this is ordinance does so is irrational. The court asked the Board at oral argument what purpose the

physician designee requirement will serve. The Board stated that the ordinance doesn't seek to micromanage medical practice in Allen County and ordinary standards of medical care would apply to the appointment and operations of physician designees. The Board's response to the question suggests that there are some substantive standards that would apply to physician designees, but the court remains uncertain about what those standards would be, and the ordinance itself provides no guidance about those standards. Further, the Board's response doesn't answer the question about the purpose served by requiring physician designees. Dr. Klopfer has stated a claim for relief on the basis that the ordinance's physician designee requirement is too irrational to survive rational basis review under the Due Process Clause of the Fourteenth Amendment. Dr. Klopfer has shown he may have a basis for relief. *Cf.* City of Cleburne, Texas v. Cleburne Living Ctr., 473 U.S. 432, 446-447, 451 (1985) (finding zoning distinction arbitrary and irrational under Equal Protection analysis). Accordingly, the motion to dismiss will be denied.

III. Conclusion and Order

For the reasons stated, the court GRANTS in part and DENIES in part the plaintiffs' amended motion for preliminary injunction [Doc. Nos. 2 & 21] and DENIES the Board of Commissioners' motion to dismiss the amended complaint [Doc. No. 26].

It is ORDERED that the county shall not enforce against the plaintiffs provisions of the Amended Ordinance concerning patient notification forms and patient identifying information. Those provisions include:

- Amended Ordinance § 10-10-2(A)(3), to the extent it requires patients to sign forms acknowledging receipt of Dr. Klopfer's emergency contact information and to the extent it requires FWWH and Dr. Klopfer to keep such written notifications on file. This part of the Ordinance shall remain enforceable to the extent it requires Dr. Klopfer to provide his patients his personal emergency contact information and emergency contact information for his Physician Designee.

- Amended Ordinance § 10-10-6(B), to the extent it authorizes the Health Officer or other government officials to review the plaintiffs' written patient notifications of emergency contact information.

- Amended Ordinance § 10-10-13, to the extent it authorizes unredacted patient information from the Plaintiffs' patients to be reported to the Indiana State Medical Licensing Board.

This order shall remain in effect until final judgment in this case or until the court enters an order providing for its rescission. No bond is required since no financial harm will accrue to the Board of Commissioners as a result of this order.

SO ORDERED.

ENTERED:  August 11, 2010

_/s/ Robert L. Miller, Jr._
Judge
United States District Court